**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 1, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PHILLIP PATRICK BACA, MARY
MOLINA MESCALL, RON
ROMERO, and BERNADETTE
MIERA,

      Plaintiffs/Cross-Appellees,

      v.

RICHARD J. BERRY, in his official
capacity as Mayor of Albuquerque,

      Defendant-Appellee/
Cross-Appellant.

\-------------------------------

LUIS ROBERTO VERA, JR.,
PHILLIP G. SAPIEN, and ANTONIO
MAESTAS,

      Attorneys-Appellants/
Cross-Appellees.

Nos. 14-2174 & 14-2181

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. 1:13-CV-00076-WJ-WPL)**

---

Mark P. Gaber, Jenner & Block LLP, and Joshua J. Bone, Campaign Legal Center
(Jessica Ring Amunson, Jenner & Block LLP, and J. Gerald Hebert, Campaign
Legal Center, with them on the briefs), Washington, DC, for Attorneys-
Appellants/Cross-Appellees and Plaintiffs/Cross-Appellees.

Luis G. Stelzner, Stelzner, Winter, Warburton, Flores, Sanchez & Dawes, P.A. (Jaime L. Dawes, Stelzner, Winter, Warburton, Flores, Sanchez & Dawes, P.A., and Patrick J. Rogers, Patrick J. Rogers, LLC, with him on the brief), Albuquerque, New Mexico, for Appellee/Cross-Appellant.

---

Before **TYMKOVICH**, Chief Judge, **HARTZ**, and **PHILLIPS**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

---

This case arises out of an award of attorneys' fees imposed as a sanction on attorneys who brought a voting-rights lawsuit against the Mayor of Albuquerque. After dismissing the case, the district court found the attorneys unreasonably multiplied proceedings in what it called a meritless case and sanctioned them under 28 U.S.C. § 1927. They argue the award was an abuse of discretion. The Mayor cross-appealed, arguing the court abused its discretion by declining to award fees under several other provisions the Mayor raised as grounds for sanctions.

Although most of the attorneys' arguments lack merit, we vacate the award of fees and remand for the court to consider whether a different trigger for the imposition of sanctions is appropriate. The Mayor dropped his cross-appeal at oral argument. Consequently, exercising jurisdiction under 28 U.S.C. § 1291, we VACATE the award of fees and REMAND for further proceedings consistent with this opinion. We also DENY the motion for sanctions on appeal.

# I. Background

Several Albuquerque residents sued Mayor Richard Berry in his official capacity as Mayor of Albuquerque in state court over the City's redistricting plan enacted after the 2010 census.[1] They sought "injunctive and declaratory relief to achieve a constitutionally acceptable and otherwise lawful redistricting of the Albuquerque City Council." App. 185. Specifically, they claimed that (1) a newly adopted Albuquerque redistricting map "minimize[d] the opportunities of Latinos to participate in the political process and to elect the representatives of their choice," in violation of Section Two of the Voting Rights Act of 1965; and (2) the new districts "deviate[d] impermissibly from population equality," in violation of the Equal Protection Clauses of both the United States and New Mexico Constitutions. *Id.* at 12, 14. The Mayor removed the case to federal court in January 2013.

After the lawsuit had been commenced, in March 2013, a city-charter amendment passed mandating that no candidate could be elected without receiving a majority of the vote. That abrogated the previous rule, under which

---

[1] As discussed, the district court sanctioned the attorneys rather than the plaintiffs in the underlying case. For easier reading, references in this opinion to "the voters" only refer to plaintiffs' lawyers, who are the parties appealing the imposition of sanctions.

the top vote recipient with a plurality of 40% or more would prevail.[2]

Subsequently, in June 2013, the Mayor provided the voters with a critical expert report. That report, created by Brian Sanderoff, purported to identify flaws in the voters' theory of the case in general and, more importantly, as described in the reports prepared by the voters' experts. We discuss those alleged flaws as they become relevant below.

Several weeks later the voters filed a motion for voluntary dismissal without prejudice of their claims. They explained that they did so "to assure that [the lawsuit] would not interfere with the upcoming [Fall] elections in the City of Albuquerque and to ascertain whether the change in the political landscape in the City of Albuquerque [*i.e.*, the city-charter amendment] would necessitate further litigation." *Id.* at 46. The Mayor opposed this motion, arguing that dismissing the case without prejudice would result in legal prejudice to him. Thus, he filed a motion asking the court to instead dismiss the case with prejudice.

On September 30, rather than granting or denying either motion, the court entered a stay in the case and "defer[red] ruling until after the upcoming

---

[2] Before the charter amendment, a candidate who was not the candidate of choice of the Latino community could win an election with a plurality while two candidates who were both preferred candidates of the community split a majority. According to the voters, this was how Mayor Berry was elected in 2009. Post-amendment, a runoff would be required between the two top candidates. The voters thought this might moot their original redistricting complaints. *See* App. 112 (explaining the changes might "remedy the constitutionally deficient redistricting map without further Court intervention").

[November] mayoral election." *Id.* at 190. The court found the facts before it insufficiently clear to justify ruling definitively on either motion at that time. In its order, the court noted that, after "the conclusion of the mayor's race, the Court will hold a status conference and the parties shall advise the Court how they wish to proceed." *Id.* at 191. And it instructed the voters to "be prepared to advise the Court whether, given the results of the mayoral election, they still wish to pursue litigation on the allegations raised in the complaint." *Id.*

Neither party filed anything further from that point forward, and the mayoral election came and went. On November 12, the court held a telephone conference, at which the voters "advised . . . that there was also an upcoming election for councilperson, and suggested continuing the stay," again suggesting that after this election the "issue [might] become moot." *Id.* at 192, 195. The court understood that as a request to stay the decision until it became clear whether or not "further legal action was necessary, based on the implementation of the [city-charter amendment]." *Id.* at 196. Nothing happened for two months aside from the court vacating a December 17 telephone conference because of its scheduling issues. The record reflects no action by the voters to advise the court of the effect the election had on their claims or whether they wished to proceed. Accordingly, the dueling motions remained pending.

In January 2014, the court revisited the motions. It noted that, although its stay had been based on the voters' "representations that the outcome of the

elections would determine whether the underlying issues had become moot," they apparently still could not "make a decision about whether they have a meritorious lawsuit or not." *Id.* The court found that the voters' failure to take any affirmative action post-election indicated their claims that the results of the Fall elections would let them "determine whether there remained an issue to litigate" had been "disingenuous." *Id.* In short, the court found their reasons for seeking dismissal without prejudice insufficient. Finding it "apparent that there [was] no longer a case to pursue," the court denied the voters' motion to dismiss without prejudice and dismissed the case with prejudice. *Id.* at 195–96.

The Mayor subsequently moved for an award of attorneys' fees and costs under a host of provisions. After holding a sanctions hearing, the court ruled on the motion in August 2014. The court only awarded sanctions under 28 U.S.C. § 1927, which allows the imposition of fees on lawyers who "unreasonably and vexatiously" multiply proceedings. Although the court found the lawsuit was not filed in bad faith, it found that "at some point during the course of the litigation," counsel's conduct "in maintaining [the] case multipl[ied] the proceedings in an unreasonable and vexatious manner." *Id.* at 405. The court concluded that "the magic date that this case was no longer viable and . . . counsel unreasonably continued this matter was June 25, 2013, the date [counsel] was provided with [Mr. Sanderoff's] expert report." *Id.* at 407. According to the court, "[u]pon reading that report, it would have been clear to a reasonable attorney that this

case no longer had merit."  *Id.*  Thus, the court imposed an award of attorneys'

fees, beginning from June 25, 2013, amounting to $48,217.95.

The voters have appealed only that order granting attorneys' fees.

## II.  Analysis

Federal law provides that any attorney "who so multiplies the proceedings

in any case unreasonably and vexatiously may be required by the court to satisfy

personally the excess costs, expenses, and attorney's fees reasonably incurred

because of such conduct."  28 U.S.C. § 1927.  This is an "extreme standard," and

fees should be awarded "only in instances evidencing a serious and standard

disregard for the orderly process of justice."  *AeroTech, Inc. v. Estes*, 110 F.3d

1523, 1528 (10th Cir. 1997) (internal quotation marks omitted).  Thus, courts

must "strictly construe[]" the statute to guard against "dampen[ing] the legitimate

zeal of an attorney in representing his client."  *Braley v. Campbell*, 832 F.2d

1504, 1512 (10th Cir. 1987) (en banc).

Courts need not find that an attorney subjectively acted in bad faith.

Rather, "any conduct that, viewed objectively, manifests either intentional or

reckless disregard of the attorney's duties to the court[] is sanctionable."

*Hamilton v. Boise Cascade Express*, 519 F.3d 1197, 1202 (10th Cir. 2008)

(internal quotation marks omitted).  The statute makes attorneys potentially liable

for harm caused "because of" unreasonable and vexatious multiplication of

proceedings.  28 U.S.C. § 1927.  Thus, "there must be a causal connection

-7-

between the objectionable conduct of counsel and multiplication of the proceedings," such that the conduct "result[ed] in proceedings that would not have been conducted otherwise." *Peterson v. BMI Refractories*, 124 F.3d 1386, 1396 (11th Cir. 1997); *see also Lee v. First Lenders Ins. Servs., Inc.*, 236 F.3d 443, 445 (8th Cir. 2001).

Although we generally review an award of fees under § 1927 for an abuse of discretion, if "the exercise of that discretion *depended* on the resolution of a purely legal issue," we review that issue de novo. *Hamilton*, 519 F.3d at 1202 (emphasis added). We emphasize "depended" because many of the voters' assertions of legal error on appeal attack legal analysis upon which the imposition of sanctions did not obviously depend, contained in orders not designated in their notice of appeal. *Cf. Navani v. Shahani*, 496 F.3d 1121, 1133 (10th Cir. 2007) (stating we have jurisdiction only over orders appellants designate in their notice of appeal). We address those instances as they become relevant. For now, we only note that barring any actually relevant legal error, a court's discretion to award fees is broad if it concludes an attorney acted in an objectively unreasonable way that multiplied proceedings.[3]

---

[3] A non-exhaustive list of sanctionable conduct includes cases where "an attorney acts recklessly or with indifference to the law," when "an attorney is cavalier or bent on misleading the court," when he "intentionally acts without a plausible basis," or "when the entire course of the proceedings was unwarranted." *Steinert v. Winn Grp., Inc.*, 440 F.3d 1214, 1221 (10th Cir. 2006). But sanctions cannot be imposed for the initiation of proceedings—"it is not possible to

(continued...)

The voters' arguments for reversal fall into two general categories: (1) the

court committed legal error in imposing the sanctions, which would be a *per se*

abuse of discretion; and (2) on these facts, imposing § 1927 sanctions is an abuse

of discretion.  We begin by asking whether the sanctions order "rest[ed] on an

erroneous view of the law."  *Roth v. Green*, 466 F.3d 1179, 1187 (10th Cir. 2006).

But we stress again that only legal errors upon which the imposition of sanctions

actually depended are reversible errors.  An otherwise free-floating legal

error—*e.g.*, one occurring in an entirely separate decision by the court—cannot

support reversal unless it necessarily resulted in the sanctions award.

## A.  Challenge to Process

The voters initially raise several complaints about the process the court

followed in imposing sanctions.  The first challenge stems from their July 5, 2013

motion under Federal Rule of Civil Procedure 41(a)(2) that the court dismiss the

case without prejudice.  As described above, when the Mayor opposed the motion

and filed his own motion requesting dismissal with prejudice, the court deferred

ruling on either motion in an order staying proceedings until after the upcoming

elections.

Although denials of requests under Rule 41(a)(2) to dismiss without

prejudice generally receive abuse-of-discretion review, "[a]bsent 'legal prejudice'

---

[3](...continued)
multiply proceedings until *after* those proceedings have begun."  *Id.* at 1225.

to the defendant, the district court normally should grant such a dismissal."

*Ohlander v. Larson*, 114 F.3d 1531, 1537 (10th Cir. 1997). And, because a "court abuses its discretion when denying a motion to dismiss under Rule 41(a)(2) based on its inconvenience," the "court's time or effort spent on the case" is not a proper consideration. *See id.* The voters complain the court's order staying the case (1) identified no legal prejudice to the Mayor, and (2) was based solely on its time or effort spent on the case. According to them, this violates *Ohlander* and amounts to a legal error sufficient to break the causal connection between any objectionable conduct of counsel and multiplication of proceedings. But, for several independent reasons, we disagree.

As an initial matter, denying a motion to dismiss is different from deferring decision on that motion by means of a stay. *Ohlander* concerned legal error arising when improper considerations enter into a decision to *deny* a motion to dismiss without prejudice. *See id.* (explaining we were considering a "district court's decision to deny a voluntary dismissal"). Here, the voters assert error in the court's stay order, not in its later order denying their motion and dismissing the case.[4] While *Ohlander* may place some constraints on a court's ability to

---

[4] This matters because the voters argue it "was the decision of the *court*, and not any conduct by Plaintiffs' counsel, that imposed the stay and result[ed] in proceedings that would not have been conducted otherwise." 1st Cx-App. Br. at 20 (internal quotation marks omitted) (alteration and emphasis in original). But they have not appealed the stay order; their claim is essentially that the sanctions were inappropriate because the stay was inappropriate. As discussed below, that

(continued...)

deny a Rule 41(a)(2) motion, it says nothing about the district court's "broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997). And "[i]t is well settled that the district court has the power to stay proceedings pending before it and to control its docket for the purpose of economy of time and effort for itself, for counsel, and for litigants." *Pet Milk Co. v. Ritter*, 323 F.2d 586, 588 (10th Cir. 1963) (internal quotation marks omitted). Thus, the stay order comports with our precedent. And the voters identify no reason the stay, as a factual matter, fell outside the court's broad discretion to control its docket.

Moreover, even if *Ohlander*'s rule reached as far as the voters think, the court did not elevate its convenience over potential legal prejudice to the defendant in staying the case. Proper considerations in the legal-prejudice inquiry include "the opposing party's effort and expense in preparing for trial; excessive delay and lack of diligence on the part of the movant; insufficient explanation of the need for a dismissal; and the present stage of litigation." *Brown v. Baeke*, 413 F.3d 1121, 1124 (10th Cir. 2005). But these "factors are neither exhaustive nor conclusive" and courts "should be sensitive to other considerations unique to the circumstances of each case" in determining legal prejudice, including the equities facing both parties. *Id.*

---

[4](...continued)
argument has an independent causal infirmity—the decision to award sanctions did not depend on the resolution of any legal issue in the stay order.

The voters claim the court "considered and rejected the city's assertions of legal prejudice," 1st Cx-App. Br. at 22, implying the court concluded that dismissing the case without prejudice would not prejudice the Mayor. Under the voters' view of *Ohlander*, that would have meant the court had no discretion to do anything but dismiss the case. *See id.* at 23 (asserting the court "answered" the question of "whether [the] case should be dismissed with or without prejudice" against the Mayor). Thus, they conclude, the court's "sole reason for staying the case rather than granting the motion to dismiss without prejudice was the court's time or effort spent on the case," *i.e.*, its convenience. *Id.* at 22–23 (internal quotation marks omitted). But this argument reads too much into the court's order.

What the court actually said was that "[a]t [that] point, the record [was] insufficient to warrant dismissal with prejudice" and that staying the case until after the "upcoming mayoral election" would "prejudice[] neither" party and benefit judicial economy. App. 190. This must be understood in the context of the reasons the voters gave for seeking dismissal without prejudice. The asserted reason for seeking a dismissal was "to assure that [the lawsuit] would not interfere with the upcoming elections . . . and to ascertain whether" further litigation would be necessary after the city-charter amendment. *Id.* at 46. The Mayor objected to that request, arguing the legal-prejudice factors counseled against allowing dismissal without prejudice. The sufficiency of the reasons for

-12-

seeking dismissal was key to the legal-prejudice inquiry and, consequently, key to the resolution of the motion.

Complicating the inquiry, however, was that the voters' reason for seeking dismissal without prejudice turned on the uncertain future effect of the city-charter amendment on the upcoming elections.  The court apparently thought the voters' explanation sufficiently unpersuasive to make it prudent to wait until the upcoming election actually happened before reaching a final decision.[5]  *See* App. 190 (reasoning that if the city-charter amendment indeed "render[ed] further legal action unnecessary," as the voters conjectured, they "would have no need to continue to prosecute [the] case," but that if it did not, they would "be free to pursue the litigation without having to re-file the case").

Thus, we do not read the order as concluding the Mayor would suffer no legal prejudice from a dismissal without prejudice; we read it as expressing uncertainty about whether legal prejudice would attach and staying the case

---

[5]  Even after that election passed, the voters did nothing beyond requesting an extension of the stay to determine the amendment's effect on yet another election. That was their last action before the court denied the motion to dismiss without prejudice and granted the Mayor's motion to dismiss with prejudice in January 2014.  By that time, the election-based reasons for seeking dismissal without prejudice lacked salience, and the voters had offered no substitute reasons for dismissal.  Failing to offer current, relevant reasons for dismissing without prejudice probably offers an "insufficient explanation of the need for a dismissal." *Brown*, 413 F.3d at 1124.  The court apparently thought so. *See* App. 196 (noting the election-centric reasons for dismissal "seem to be disingenuous" since after the election's passage the voters had not yet "ma[d]e a decision about whether they ha[d] a meritorious lawsuit or not"); *id.* at 410 (stating none of the reasons for dismissing without prejudice were "compelling").

-13-

accordingly. For those reasons, the court's reasoning cannot be fairly characterized as resting solely on its convenience. In fact, the court explicitly enumerated the legal-prejudice factors at the outset of the order and concluded ultimately that its decision to stay the case prejudiced neither party. Far from resting solely on convenience, the court's decision indicates full awareness of the need to consider legal prejudice. Thus, even if the voters were right that *Ohlander*'s rule restricts the stay-granting power of district courts, the court fully complied with its dictates.

Finally, even assuming the correctness of the two premises just rejected— (1) that *Ohlander* prevents courts from staying a decision on a motion to dismiss without prejudice without first finding prejudice to the non-movant, and (2) that the court failed to base its decision on potential legal prejudice to the defendant— the voters would still face an insurmountable obstacle. They would have only shown a legal error in the September 2013 stay order. It would remain to be shown that imposing sanctions in August 2014 depended on that incorrect legal conclusion. We do not see how it could have. Perhaps it would have if this supposed error *necessarily* enabled or led to the conduct later sanctioned as multiplication of proceedings. But that does not follow. As an initial matter, the conduct the court sanctioned as impermissible multiplication of proceedings began in June 2013. It is difficult to see how an error in a September 2013 stay could have caused that conduct; by the time the court entered the stay, the

-14-

proceedings had already multiplied. Nor can they show—to the extent this is their claim—that absent the legal error the court would have necessarily granted their motion to dismiss without prejudice. The court certainly could have still denied the motion to dismiss even had it applied the law as the voters perceive it.

It is one thing to identify a legal error in a decision one actually appeals, since it makes some sense to assume the decision rested in part on that error. It is another to argue a court order should be reversed based on a legal error in a separate order issued at an entirely different stage of proceedings. The voters fail to show how this error—assuming it occurred—would even be relevant to the issue on appeal. A far tighter connection must be demonstrated. As far as we can tell, their challenge boils down to a backdoor attack on a decision they have not appealed with law that does not apply. Accordingly, the challenge to the court's order staying the case cannot resolve this appeal.

Two other complaints about the court's process can be readily dismissed. The voters allege the court "invite[d] [their] actions by statements in its own orders" and thus could not sanction them "for following the court-approved path." 1st Cx-App. Br. at 24. This gets the chronology backwards. The court found the sanctionable conduct began in June 2013. Statements made in the stay order could not have "invited" sanctionable conduct months earlier. Moreover, the voters cite no Tenth Circuit law in support of their claim, and the out-of-circuit

-15-

cases cited[6] are unpersuasive. Those cases involved denials of motions for summary judgment, which were in essence determinations that the cases contained meritorious, triable issues. Nothing similar happened here.

The voters next claim that the district court committed reversible error in not allowing plaintiffs to "proceed with only the state claim in state court," *id.* at 26. That argument also fails. As background, the voters offered, for the first time, at the November telephone conference to dismiss[7] the federal claims and proceed only with state law claims in state court. The Mayor did not acquiesce. In asserting error, the voters rely on an out-of-circuit case stating that in these cases the "mere prospect of the transfer of litigation to state court [is] an insufficient basis for denying [a] motion for voluntary dismissal." *Davis v. USX Corp.*, 819 F.2d 1270, 1275 (4th Cir. 1987). They provide no Tenth Circuit case for this proposition, and because the legal-prejudice factors are "neither exhaustive nor conclusive," *Brown*, 413, F.3d at 1124, it is far from certain we would adopt such a bright-line rule. But the insurmountable causal problems the voters would face even if we did mean we need not decide that question.

---

[6] *Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d 943 (Fed. Cir. 2010); *Browning v. Kramer*, 931 F.2d 340 (5th Cir. 1991); *In re Ruben*, 825 F.2d 977 (6th Cir. 1987).

[7] It is unclear from the record whether this offer was to dismiss with or without prejudice.

The *Davis* rule would only apply to the January 2014 order actually denying plaintiffs' motion for voluntary dismissal. But nothing in that order indicates the prospect of proceeding in state court influenced the denial.[8] And, again, the voters decided against appealing that order, choosing instead to appeal only the September 2014 order imposing sanctions. As mentioned, errors in separate, not-appealed orders are only pertinent to the degree they necessarily resulted in errors in the order appealed.

We doubt this would be such an error, given that the sanctions rested on the finding that sanctionable conduct began long before January 2014. Perhaps recognizing that causal problem, the voters in places appear to claim the court committed reversible error in the sanctions order by rejecting an argument that offering to proceed in state court should have precluded sanctions. But we see no reason such an offer would bar a court from later concluding that a party improperly multiplied proceedings, and the voters cite no authority to that effect.[9] The sanctions order only mentioned the offer in dismissing the voters' attempt to shift blame for prolonging the case to the Mayor's rejection of that offer. *See*

---

[8] The denial was based entirely on the underlying case's lack of merit and the court's finding that the voters' claimed reasons for seeking dismissal without prejudice were "disingenuous" and insufficient. App. 196.

[9] This case's chronology demonstrates why that would be an odd rule. The offer to proceed in state court was made months after the case became meritless and months after the court found the voters began unreasonably multiplying proceedings in a meritless case.

-17-

App. 410 ("The Court finds no fault with Defendant's refusal to [return to state court] because [it] would involve the continuation, or possible continuation, of a meritless case."); *id.* at 493 (court noting the Mayor "exercised a right [he has] to remove to federal court" and lack of any motion to remand). The voters do not dispute that the Mayor had the right to remove the case or that they never moved to remand. Nor do they claim the Mayor was required to acquiesce in their offer to return to state court. Thus, their argument that this case *could have* proceeded in state court is beside the point. Of course the state courts could have adjudicated the claim, but so could the federal courts, and this claim was validly in federal court. We detect no error.

Rounding out their process challenges, the voters claim the court improperly applied a subjective standard by commenting on their "subjective knowledge regarding the merits of [their] case." *Id.* at 410. This argument, however, rests on a legal misunderstanding. To be sure, they point to *Braley* and that case explained that § 1927 allows sanctions "against an attorney personally for conduct that, viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court." *Braley*, 832 F.2d at 1512. But that does not mean an attorney's subjective bad faith is irrelevant, let alone that commenting on apparent bad faith is reversible error. To the contrary, an "attorney's actions are considered vexatious and unreasonable under § 1927 if the attorney acted in bad faith." *Dreiling v. Peugeot Motors of Am., Inc.*, 768 F.2d

-18-

1159, 1165 (10th Cir. 1985); *see also Braley*, 832 F.2d at 1512 (noting

parenthetically that attorneys are "accountable under § 1927 *not only* for

subjective bad faith conduct *but also* for 'reckless indifference to the merits of a

claim'" (emphasis added)); *cf. Steinert v. Winn Grp., Inc.*, 440 F.3d 1214, 1221

(10th Cir. 2006) (listing, as an example of sanctionable conduct under § 1927,

instances when attorneys are "cavalier or bent on misleading the court").[10]

    The court committed no legal error in commenting on plaintiffs' subjective

knowledge regarding the merits of their case.[11]

------

[10] The voters point to our statement in *Miera v. Disneyland Insurance Co.*,
143 F.3d 1337 (10th Cir. 1998), that *Braley* "rejected a subjective good faith
inquiry." *Id.* at 1342. But that takes *Miera* out of context. That case simply
described *Braley*'s rejection of the argument that § 1927 sanctions "should be
imposable against an attorney personally *only* for subjective bad faith." *Braley*,
832 F.2d at 1512 (emphasis added). To read that as holding that subjective bad
faith has no place in this analysis goes too far, and makes scant sense. Has an
attorney discovered to be acting in bad faith but who cloaked that bad faith
behind objectively reasonable actions insulated himself from § 1927 sanctions?
Nothing in the statute requires that result. It would be strange if subjective bad
faith did not constitute "conduct that, viewed objectively, manifests . . .
intentional . . . disregard of the attorney's duties to the court." *Id.*

[11] Moreover, the court plainly rested its sanctions award on counsel's
"objectively unreasonable" pursuit of the case after June 25. App. 407. Even on
the voters' erroneous view of the law, a court that expressly bases sanctions on an
attorney's objectively unreasonable conduct surely would not err by commenting
on the possibility that the conduct stemmed from subjective bad faith.

### B. *Challenge to the Merits*

The voters also contend the court rested its finding that their case ceased to be meritorious after June 25 on a legally erroneous interpretation of their Voting Rights Act and one-person-one-vote claims. We disagree.

We begin with the Voting Rights Act claim. The Supreme Court, in *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986), established a three-part prima facie framework for a vote-dilution claim under Section Two of the Act. First, plaintiffs must prove their minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district." *Sanchez v. State of Colo.*, 97 F.3d 1303, 1310 (10th Cir. 1996). Second, they must show "the minority group is politically cohesive." *Id.* (internal quotation marks omitted). Third, they must show "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Id.* These factors are necessary, but not sufficient, to establish a vote-dilution claim.

In selecting June 25 as the "magic date," the district court concluded that the voters' experts never established the *Gingles* factors, and that Mr. Sanderoff's report simply confirmed that failure. The Mayor does not dispute that the voters' expert Dr. Lonna Rae Atkeson purported to identify racially polarized voting. *See* App. 128 (Dr. Atkeson asserting that "the evidence is clear that racially polarized

voting is present," which she concluded was "indicative of the need for majority-minority districts within the city to provide minorities an equal opportunity to elect candidates of their choice"). The first *Gingles* prong is not contested; the question is whether Dr. Atkeson's testimony sufficed to establish the last two prongs.

The voters correctly emphasize that the second and third *Gingles* factors can be addressed "conjunctive[ly]." *Sanchez*, 97 F.3d at 1315. But that does not tell us whether Dr. Atkeson actually addressed those factors. The voters breeze over this point, assuming that asserting the existence of racially polarized voting is sufficient shorthand for asserting the final two *Gingles* factors. That assumption is incorrect. Dr. Atkeson made two statements: (1) an assertion that racially polarized voting exists; and (2) an "assertion" that was really plaintiffs' desired conclusion in disguise—*i.e.*, that Latinos were being deprived of an equal opportunity to elect candidates of their choice. This does not satisfy *Gingles*, because it ignores entirely whether the white majority was actually voting as a bloc to defeat the minority's preferred candidate. That omission is perhaps unsurprising in light of Mr. Sanderoff's finding that in *every election* selected by Dr. Atkeson "in which . . . Hispanic voters had a preferred candidate," it turns out "the preferred candidate of the Hispanic population won the election." App. 70; *see also id.* at 470 (testimony at sanctions hearing reiterating this deficiency in Dr. Atkeson's report).

-21-

Put another way, the district court only erred if a general assertion that racially polarized voting exists suffices to satisfy *Gingles*'s third prong. The voters provide no cases for that proposition, and we doubt they could. Consider a case where racially polarized voting exists, but a minority is nevertheless electing candidates of its choice. In that case, the requirement that the white majority votes as a bloc to defeat the minority's preferred candidate would be unsatisfied. While racially polarized voting is necessary to satisfy the third prong, it is not sufficient. We indicated as much in *Sanchez*, where, albeit in our discussion of the first prong, we noted that "part of the *Gingles* threshold inquiry" is whether the district court "can fashion a permissible remedy in the particular context of the challenged system." *Sanchez*, 97 F.3d at 1311. Naturally, there is no remedy to fashion if a minority group is not actually prevented from electing candidates of choice.

Contrary to the voters' framing of the issue, the problem was not that their experts collapsed the second and third *Gingles* prongs. The problem was that their experts entirely failed to address whether the white majority was *actually* voting as a bloc to defeat minority-preferred candidates. It was not error to find this was a fatal flaw in the experts' analysis. And it was not error to treat Mr. Sanderoff's report as the final straw, because the report revealed why the flaw was there—*minority-preferred candidates had won every one of the plaintiffs' exemplar races*.

-22-

In sum, it was insufficient for Dr. Atkeson to simply nod to the desired conclusion by claiming racially polarized voting showed Latinos needed the ability to elect candidates of their choice without asserting the existence of a necessary premise: that the white majority was actually voting as a bloc to defeat the minority's preferred candidates. Because the voters never even attempted to assert that necessary premise, there was no *Gingles*-related legal error.[12]

We turn next to the voters' assertion that the district court erred in finding their one-person-one-vote claim lacked merit. At the outset, both parties treat a district court case summarily affirmed by the Supreme Court, *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004), *summarily aff'd*, 542 U.S. 947 (2004), as if it were binding law. Of course, summary affirmances have limited precedential value. *See Plowman v. Massad*, 61 F.3d 796, 799 n.1 (10th Cir. 1995) (noting that "the precedential effect of a summary affirmance extends no further than the precise issues presented and necessarily decided by those actions" (internal quotation marks omitted) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 784 n.5

---

[12] The voters also attack the court's *Gingles* conclusion on the grounds that the court erroneously based its decision on the fact that "the challenged map resulted in five of the [city's] nine districts being majority-minority." 1st Cx-App Br. at 42. That reads too much into the order. To be sure, the court juxtaposed that observation about the number of majority-minority districts with the claim that the plan disadvantaged minority voters. But this was merely a general observation about the factual context of the case, not a reason for rejecting the *Gingles* claim. It is wrong to assert, as the voters do, that the court found the *Gingles* claim meritless "*because* several majority-minority districts were present." *Id.* at 43 (emphasis added). That conclusion flowed from the failure of their experts to even attempt to satisfy *Gingles*'s third prong.

(1983)). Thus, the particularities of *Larios*'s holding that certain Georgia reapportionment plans violated one-person-one-vote principles, *see Larios*, 300 F. Supp. 2d at 1357–58, have little to say to our inquiry in this case. The question is not whether that district court's reasoning could support a one-person-one-vote claim here, but whether the court erred in determining such a claim was untenable under governing precedent.

It is difficult to discern the contours of the voters' position under relevant law, particularly when they focus single-mindedly on the "merit [of their claims] under *Larios*," 1st Cx-App. Br. at 40. Read most charitably, they appear to be claiming they made a meritorious one-person-one-vote claim attacking the constitutionality of voter-population deviations of plus or minus 5% in Albuquerque's plan.[13] But their opening brief identifies no Tenth Circuit or Supreme Court cases showing the district court necessarily erred in finding their claim, so construed, lacked merit.[14] In fact, the extent of their analysis is that the

_____

[13] The Mayor denies the population deviation was even that high. Because we conclude the voters waived this argument, we do not reach that point.

[14] Although we hold the argument waived on the basis of an insufficient opening brief on appeal, we perhaps could have held it was forfeited below because it was not made there—at least, not in the form it takes now. The voters certainly made no such argument in their filings opposing sanctions. And, at the hearing, their argument was again based on nothing but *Larios* and appeared to be that Albuquerque needed to justify any deviation above zero. *See, e.g.*, App. 453 (asking Mayor's expert whether "the Supreme Court case" [sic] of "*Cox v. Larios*" "mandat[ed] that deviation needs to be taken down to zero unless you can articulate why you could not do that"). Of course, the Supreme Court's summary

(continued...)

-24-

constitutionality of such deviations was a question "left open by *Larios*."  1st Cx-

App. Br. at 41.  Again, it is irrelevant whether the Northern District of Georgia

opined on that point.  The question is whether such an attack could be or was

grounded in law we must follow.

The law with which the voters must grapple to show their claim was

colorable is well established.  An "apportionment plan with a maximum

population deviation [from ideal district size] under 10% falls within" the

"category of minor deviations" that are "insufficient to make out a prima facie

case of invidious discrimination under the Fourteenth Amendment so as to require

justification by the State."  *Voinovich v. Quilter*, 507 U.S. 146, 161 (1993); *see*

*also White v. Regester*, 412 U.S. 755, 764 (1973) (observing "relatively minor

population deviations" under 10% and noting plaintiffs were thus unable to

establish a violation "from population variations alone").  The upshot is that such

minor population deviations are "presumed to be constitutionally valid"—*i.e.*,

---

[14](...continued)
affirmance in *Larios* "mandated" no universal principles, and the cases squarely reject the proposition that Albuquerque needed to justify any deviation above zero.  *See Ala. Black Legis. Caucus v. Alabama*, 135 S. Ct. 1257, 1263 (2015) (noting a state plan that attempted to avoid deviating from the ideal "by more than 1%" pursued "a more rigorous deviation standard than our precedents have found necessary under the Constitution"); *see also Voinovich v. Quilter*, 507 U.S. 146, 161 (1993); *White v. Regester*, 412 U.S. 755, 764 (1973).  Moreover, the voters only touched on this point in questions to the Mayor's expert; we detect no clear one-person-one-vote arguments in their actual oral argument.  To now argue their claim was meritorious because it attacked the constitutionality of 5% deviations may be a stretch.  Because we conclude the point was in any event waived in the opening brief, we need not decide this question.

more than deviation is needed in such cases. *League of Women Voters v. City of Chi.*, 757 F.3d 722, 725 (7th Cir.), *cert. denied*, 135 S. Ct. 688 (2014). The voters never address these cases or identify any statements by this court or the Supreme Court contradicting these principles. More importantly, they identify no facts or law supporting an argument that the presumption was rebutted (or even rebuttable) on the facts of this case. Nor did they below, which is a significant omission in light of the assertion in Mr. Sanderoff's report that all districts were within 5% of ideal district size. Finally, as the Supreme Court recently reiterated, a 5% deviation is generally permissible in these cases. *Ala. Legis. Black Caucus v. Alabama*, 135 S. Ct. 1257, 1263 (2015).

A bare statement that someone *could have* made an argument is not enough. "[C]ursory statements, without supporting analysis and case law, fail to constitute the kind of briefing that is necessary to avoid application of the forfeiture doctrine." *Bronson v. Swensen*, 500 F.3d 1099, 1105 (10th Cir. 2007); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived . . . ."). Because the voters identify no grounds on which we could rest a conclusion that the district court's decision departed from governing law, we consider this argument waived.

Underlying all these arguments is the voters' claim that, if they had not chosen to seek dismissal without prejudice, they may have been able to supplement their expert reports or depose Mr. Sanderoff at a later date. Their

point seems to be this could have allowed them to build a counterargument to his assertions about the merit of their claims. But what they could have done is largely beside the point, given their failure, even after realizing sanctions were a possibility, to combat those assertions in any convincing way.[15] Mr. Sanderoff's report purported to show fatal flaws in the case in June 2013. The question here is whether, when the court considered imposing sanctions in August 2014, it had any reason to doubt those flaws existed. If anything, the voters' failure to take further steps they now highlight as available to them might cut in favor of the court's ultimate finding that the case became meritless on June 25, 2013. After all, Mr. Sanderoff's report claimed to identify holes in the voters' theory; declining to take an opportunity to combat the report could support a negative inference about the quality of that theory.

In short, nothing in the record or in the briefing convinces us the court rested its decision on any legal error.

### C. Factual Propriety of Sanctions

The voters' inability to show legal error reduces them to arguing that even without legal errors "the record in this case manifestly does not support the imposition of sanctions." 1st Cx-App. Br. at 29. They emphasize that the only

---

[15] At no point in contesting sanctions did they directly assert Latinos were unable to elect their candidates of choice, which was the key *Gingles* issue highlighted by Mr. Sanderoff's report. Nor did they make any one-person-one-vote argument not premised on the misunderstanding of *Larios* we discussed above.

substantive motion they filed was their opposed motion to dismiss on July 5. In large part, this misses the point. Much of this question turns on whether the court abused its discretion in finding that multiplying proceedings after June 25 was sanctionable because the case became meritless at that time. We have already explained why the court did not err in finding the *Gingles* and one-person-one-vote arguments lacked merit, as well as why the voters cannot blame the court's stay for extending proceedings. Ample evidence supported the court's decision. When the court looked back in August 2014, it was apparent that the case was substantively weak from the start. Mr. Sanderoff's report hammered home the intractability of those flaws by showing the *Gingles* claim could not succeed and that district deviations made it unlikely that the one-person-one-vote claim would. It was not an abuse of discretion to find it became objectively unreasonable to pursue the case further on June 25, 2013.

With June 25 established as the critical day, the remaining question is whether the court abused its discretion in finding the voters in fact acted in a way that unreasonably and vexatiously multiplied proceedings. The voters' main argument here boils down to a comparison of this case to some of our other § 1927 cases they claim exemplify more egregious conduct. Even if that were true, however, none of those cases suggested they were establishing a floor below which a court could not permissibly impose sanctions. In a vacuum, it matters little to our review for abuse of discretion that some lawyers may have acted

-28-

worse than the voters did.  If they acted in a way the court could have justifiably found to be objectively unreasonable, § 1927 requires no more.

That, however, brings us to the reason we cannot affirm the award in its current form.  In short, we cannot affirm what appears to be the court's finding—implicit in the imposition of fees beginning on June 25—regarding what the sanctionable conduct actually was.  Section 1927 sanctions are for "*conduct* that, viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court."  *Hamilton*, 519 F.3d at 1202 (internal quotation marks omitted) (emphasis added).  As explained earlier, this means excess costs and fees for which a sanctioned attorney must pay must have been caused by that attorney's sanctionable action.  Here, the court found the voters' sanctionable conduct was "continu[ing] to pursue th[e] case" after the receipt of Mr. Sanderoff's report on June 25 would have made "clear to a reasonable attorney that th[e] case no longer had merit."  App. 407.

To be clear, the court did not abuse its discretion by finding June 25 was the date after which it became sanctionable for the voters to multiply proceedings in an objectively unreasonable way.  But, by imposing sanctions beginning on June 25, it necessarily found they did something *at that point* that multiplied proceedings within the meaning of the statute.  Because the voters took no affirmative action on that day, the only potentially sanctionable June 25 "conduct" we can see is their failure to immediately cut the case short—*i.e.*,

dismiss the case with prejudice—after receiving Mr. Sanderoff's damaging report.[16]

We do not discount the possibility that in some cases, failing to act can be sanctionable conduct under § 1927. *See, e.g.*, *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 755–57, 760 (1980) (observing a party's "uncooperative behavior" and "deliberate inaction in handling" a case leading to sanctions (internal quotation marks omitted)). After all, the statute "authoriz[es] the assessment of costs against dilatory attorneys." *Id.* at 760. Surely an attorney's failure to act could be objectively unreasonable and vexatious and multiply the proceedings in a case by causing the opposing party to file motions to compel action. More pertinent here, in a meritless case, protracted failure to do anything but dismiss the case (or, perhaps, insisting on conditions of dismissal that themselves create further litigation) might be sanctionable.

But the court's decision below does not appear to rest on this type of reasoning. Rather, the award in effect found the voters' unreasonable failure to dismiss the case began the very day they received the report. That cannot be reconciled with the need to construe § 1927 to avoid "dampen[ing] the legitimate zeal of an attorney in representing his client," *Braley*, 832 F.3d at 1512. When new information appears to make it objectively unreasonable to pursue a case, an

_____

[16] A dismissal with prejudice, of course, was the only type of dismissal to which the Mayor was willing to acquiesce.

-30-

attorney must have at least some time—surely a day or two—to study that information and make a decision regarding its impact before failing to drop the case becomes sanctionable unreasonable pursuit. *See Riddle & Assocs., P.C. v. Kelly*, 414 F.3d 832, 835 (7th Cir. 2005) ("If a lawyer pursues a path that a reasonably careful attorney would have known, *after appropriate inquiry*, to be unsound, the conduct is objectively unreasonable and vexatious." (emphasis added)).

Consequently, we vacate the award of fees and remand for further proceedings consistent with this opinion. The court is free to revisit the fees question on remand and certainly may reimpose fees if it finds a more appropriate triggering action. It is possible that an affirmative action creating further litigation taken by the voters after June 25 might suffice, or that a lengthier delay after June 25 will do on its own. We express no opinion on those possibilities here.[17] We only note that lawyers and litigants generally should have some reasonable leeway to review ostensibly damaging materials, even if the materials are, ultimately, the last straw proving their case's weakness.

---

[17] Doing so would be largely pointless. With respect to "a matter committed to the district court's discretion," like the propriety of § 1927 sanctions, "we cannot invoke an alternative basis to affirm unless we can say as a matter of law that it would have been an abuse of discretion for the trial court to rule otherwise." *Ashby v. McKenna*, 331 F.3d 1148, 1151 (10th Cir. 2003) (internal quotation marks omitted). Even if a more appropriate triggering date exists, we cannot say on this record that it would have been an abuse of discretion for the district court to *decline* to impose sanctions.

But they should keep in mind that this time is not unlimited. The necessary time will of course be case-specific and largely within the discretion of the district court. Some relevant, although non-exclusive factors would include the strength of the underlying case and the nature of the new developments affecting the objective reasonableness of further pursuing the case. We leave any further investigation into those questions for the district court on remand and note also that such investigation may be unnecessary if it finds an affirmative action by the voters that multiplied proceedings in an objectively unreasonable way.[18]

## III. Conclusion

For the foregoing reasons, we VACATE the fee award and REMAND for proceedings consistent with this opinion. We DENY the voters' motions for sanctions against the Mayor for his cross-appeal.[19]

---

[18] We note, however, that because the Mayor did not contest the voters' argument that attorney Antonio Maestas should not have been sanctioned, § 1927 liability on remand should not extend to Mr. Maestas.

[19] The Mayor cross-appealed in this matter, asking us to find the district court abused its discretion in failing to award sanctions under a host of other provisions. At oral argument, however, the Mayor conceded that pursuing the cross-appeal further was unwise, and dropped it. After oral argument, the voters moved for sanctions under § 1927 and Federal Rule of Appellate Procedure 38, which allows the award of damages for a frivolous appeal. We deny that motion.

Nos. 14-2174 and 14-2181, *Baca et al. v. Berry*

**PHILLIPS**, Circuit Judge, dissenting:

Although I agree with the majority that the district court abused its discretion in selecting June 25, 2013 as the trigger date for sanctions, I would go further and conclude that the district court abused its discretion in awarding any sanctions at all. I respectfully dissent.

In evaluating the district court's sanctions directing plaintiffs' attorneys to pay the attorneys' fees incurred by the Mayor (the City)[1], a good starting place is the language of 28 U.S.C. § 1927 itself:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

We have cautioned that the power to impose sanctions under this section must be strictly construed and used only when attorneys show a "serious and standard [sic] disregard for the orderly process of justice." *Braley v. Campbell*, 832 F.2d 1504, 1512 (10th Cir. 1987) (en banc) (quoting *Dreiling v. Peugeot Motors of Am., Inc.*, 768 F.2d 1159, 1165 (10th Cir. 1985)). Along this line, we have "recognize[d] the importance of ensuring that § 1927 'in no way will dampen the legitimate zeal of an attorney in representing his client.'" *Braley*, 832 F.2d at 1512 (quoting H.R. Rep. No. 96-1234, at 8 (1996) (Conf. Rep.)). "Sanctions under § 1927 are appropriate when an attorney acts

---

[1] The plaintiffs sued Mayor Richard J. Berry in his official capacity. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) (stating that suits against officials in their official capacity should be treated as suits against the governmental entity).

'recklessly or with indifference to the law.'" *Dominion Video Satellite, Inc. v. Echostar Satellite L.L.C.*, 430 F.3d 1269, 1278 (10th Cir. 2005) (quoting *Braley*, 832 F.2d at 1511). "Sanctions are appropriate, then, when an attorney is cavalier or 'bent on misleading the court . . . .'" *Miera v. Dairyland Ins. Co.*, 143 F.3d 1337, 1342 (10th Cir. 1998) (quoting *Herzfeld & Stern v. Blair*, 769 F.2d 645, 647 (10th Cir. 1985)).

Although we review a district court's award of sanctions for an abuse of discretion, we review de novo a district court's legal determinations underlying the exercise of that discretion. *Hamilton v. Boise Cascade Express*, 519 F.3d 1197, 1202 (10th Cir. 2008) (citations omitted). Under this standard, I conclude that the district court abused its discretion in awarding any sanctions against plaintiffs' attorneys. In explaining why, I separate the case's history into discrete time periods and analyze each.

### 1. January 17, 2013, to June 25, 2013

On January 17, 2013, the plaintiffs (four Latino voters in Albuquerque) filed a voting-rights lawsuit in New Mexico state court, challenging a redistricting map that the Albuquerque city government adopted in 2012 after the 2010 Census. The complaint alleged claims for relief under both federal and state law. Specifically, it set forth claims challenging the redistricting map as "deviat[ing] impermissibly from population equality," in violation of the Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and of Article VI, Section 13 of the New Mexico Constitution. Appellant's App. vol. I at 14. The plaintiffs further alleged that the redistricting map "minimizes the opportunities of Latinos to participate in the political process and to elect the representatives of their choice," in violation of 52 U.S.C. § 10301

2

(formerly cited as 42 U.S.C. § 1973; Section 2 of the Voting Rights Act of 1965, as amended), as enforced by 42 U.S.C. §§ 1983 and 1988. Appellant's App. vol. I at 14–15. On January 24, 2013, the city removed the case to federal court. On March 25, 2015, at a pretrial conference, a federal magistrate judge set pretrial deadlines, including a discovery-cutoff on July 22, 2013.

On June 25, 2013, the City provided plaintiffs' attorneys with the report of their expert witness, Brian Sanderoff. In addition to serving as the city's expert witness in the lawsuit, Sanderoff had earlier managed the city's redistricting process, which led to the submission and adoption of the challenged redistricting map. In its August 29, 2014 sanctions order, the district court commenced sanctions from June 25, 2013, contending that Sanderoff's report had established that plaintiffs' claims were meritless. I agree with the majority that the district court erred in using that triggering date. As the majority notes, the plaintiffs needed time to study the report. Maj. Op. at 30–31.

But under our case law, I cannot see how the plaintiffs' attorneys had multiplied the proceedings by filing a lawsuit and being handed the opposing side's expert report. *See Steinert v. Winn Grp., Inc.*, 440 F.3d 1214, 1224 (10th Cir. 2006) (concluding that a plaintiff does not multiply proceedings by filing a complaint, even if meritless).

2. *June 26, 2013, to July 16, 2013*

On July 1, 2013, the plaintiffs' attorneys told the City's attorneys that the plaintiffs would soon seek to voluntarily dismiss their complaint without prejudice. Despite a looming discovery-cutoff date, the parties had conducted little discovery apart from exchanging expert-witness reports. Although both parties had issued written discovery

3

requests—each contesting the adequacy of the other's responses—neither party had sought a motion to compel.

On July 5, 2013, true to their word, plaintiffs' attorneys did file an "Opposed Motion to Dismiss Without Prejudice." Appellant's App. vol. I at 46. In this motion, the plaintiffs advised the district court that they desired to avoid interfering with the city elections and sought to "ascertain whether the change in the political landscape in the City of Albuquerque" had alleviated the need for further litigation. *Id.* In this regard, they "wanted to gather data from the next election in October 2013 (and possible runoff elections in November 2013) to assess whether the change in law actually addressed their concerns, or whether they would need to refile their claims at a later time." Appellant's Br. at 6; Appellant's App. vol. I at 112–13.

The referenced change in the political landscape stemmed from a March 11, 2013 city-wide election at which the voters changed the City's charter to require runoff elections when no candidate received more than 50% of the vote. Until that time, a candidate could win with anything more than 40% of the vote. The 2009 mayoral election illustrates the effect of the charter amendment. There, Mayor Berry, a white candidate, won the election with 43.82% of the vote, while two Hispanic candidates split the remaining 56% of the vote. Under the charter amendment, Mayor Berry would not have won office after the first vote, but instead a mere right to participate in a runoff election against the stronger of his two Hispanic opponents.

In view of this change, it is unsurprising that the plaintiffs' attorneys say the charter amendment led them to "reassess[] whether they needed to pursue their lawsuit."

4

Appellant's Br. at 5. In seven short weeks since filing the lawsuit, Albuquerque electoral politics had shifted dramatically. The plaintiffs felt the charter amendment could lead to a majority-Hispanic city council, which, they hoped, might "allow the Latino community to make any further necessary changes to the map through legislation rather than litigation."[2] Appellant's App. vol. I at 112; Appellant's Br. at 5.

Thus, for the period up to July 16, 2013, I cannot see how the plaintiffs' attorneys multiplied the proceedings at all, let alone unreasonably and vexatiously. I see no comparable case in which a court has found otherwise when a plaintiff's sole substantive filing was a motion to dismiss its claims without prejudice. As I read our case law, any trigger date before the City filed its motion to dismiss—on July 17, 2013—would be too soon. *Steinert*, 440 F.3d at 1225–26 (concluding that, because the sanctioned attorney did nothing with his § 1985 claims until after the opposing party moved to dismiss, "the district court abused its discretion to the extent it awarded fees based on [the opposing] counsel's preparing the . . . motion to dismiss").

Ultimately, the district court imposed sanctions against plaintiffs' attorneys to reimburse the City for its attorneys' fees incurred in seeking dismissal of the suit and obtaining sanctions. In my view, this was an abuse of discretion. I note that in *Roth v. Spruell*, 388 F. App'x 830 (10th Cir. 2010) (unpublished), we concluded that the district

---

[2] Indeed, things changed. The newly constituted city council resolved on February 14, 2014, to oppose the City's instant effort to seek sanctions. In explaining its reasoning, the council declared that the "very nature of the dispute in *Baca v. Berry* related to participation in the political process, and thus [the mayor's argument] that the suit was politically motivated is not a credible basis for frivolity[.]" Appellant's App. vol. II at 292.

5

court abused its discretion by starting § 1927 sanctions before the defendants had filed their motion to dismiss.[3] *Id*. at 833, 836–37. In that regard, we relied on *Steinert*, 440 F.3d at 1225–26, for its conclusion that "a district court abused its discretion to the extent it awarded fees based on the preparation of defendants' motion to dismiss." *Roth*, 338 F. App'x at 836. Likewise here, the award of sanctions should not have included any of the City's attorneys' fees incurred in preparing and filing its motion to dismiss.

### 3. *July 17, 2013, to September 3, 2013*

On July 17, 2013, the City refused the plaintiffs' offer to dismiss without prejudice and instead filed its own motion to dismiss with prejudice under Fed. R. Civ. P. 41(b). In support, the City claimed that the plaintiffs had failed to prosecute the case or follow court rules or orders. The City cited five factors courts use in evaluating the appropriateness of an involuntary dismissal with prejudice: "(1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions." Appellant's App. vol. I at 84 (quoting *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992) (internal quotations and citations omitted)). In support of

---

[3] In fact, in *Roth* the district court did not begin the sanctions until five months after the motion to dismiss. It was then that the defendants provided plaintiffs' attorneys a citation to a Tenth Circuit case defeating their claim for relief. We noted that "[b]ased on *Steinert*, the district court presumably could have started the clock for fees from the date of the filing of the motion to dismiss; instead, the district court used the date that [plaintiffs' attorney] was notified of the [adverse] decision . . . ." 338 F. App'x at 836.

6

its motion, the City alleged that the plaintiffs had not pursued their case or complied with discovery obligations.

Over the next seven weeks, the parties responded and replied to each other's motions to dismiss. On September 3, 2013, the district court issued a written decision, first noting its discretion in deciding whether to dismiss with or without prejudice. In assessing whether the City would suffer "legal prejudice" from a dismissal without prejudice, the district court identified four factors: (1) the effort and expense in preparing for trial; (2) any excessive delay or lack of diligence by the movant; (3) the sufficiency of the explanation of the need for dismissal; and (4) the present stage of the litigation. *See Phillips USA, Inc. v. Allflex USA, Inc.*, 77 F.3d 354, 358 (10th Cir. 1996).

After referencing the parties' finger-pointing about the other's alleged discovery delays and abuses, the district court declined to declare or apportion fault, settling the matter by reminding the parties that neither one had sought judicial intervention. In addressing the City's argument that the plaintiffs' claims for relief lacked merit, the district court noted that the City relied on "portions of an expert report by Brian Sanderoff, which pokes holes in Plaintiffs' allegations by demonstrating the success Hispanic candidates have had in past elections." Appellant's App. vol. I at 188.

At the same time, the district court also agreed that the plaintiffs needed to await the results of the upcoming election to assess whether the charter amendment had resolved their concerns: "Plaintiffs also offer a viable explanation for seeking dismissal without prejudice, claiming that they did not want this lawsuit to interfere with the upcoming city elections and pointing to a change in the law which could render moot the

present concerns they have with the current redistricting." Appellant's App. vol. I at 188. In considering the effect of the voter-passed charter amendment, particularly in regard to Mayor Berry's 2009 electoral victory with 43.82% of the vote, the district court noted that "[i]n such a scenario, the new Charter amendment could be viewed as a remedy for the alleged constitutional deficiencies in the redistricting map." *Id.* at 189.

Having weighed the city's arguments, the district court found that "[a]t this point, the record is insufficient to warrant dismissal with prejudice." *Id.* at 190. But it also found "that granting Plaintiffs' motion to dismiss the case without prejudice is not the best recourse to take, either." *Id.* So the court sua sponte imposed a stay and deferred ruling "until after the upcoming mayoral election." *Id.* In doing so, the court acknowledged the correctness of the plaintiffs' approach in monitoring the upcoming elections to see whether the charter amendment had solved their concerns. The court stated that if the election indeed showed plaintiffs that further legal action was unnecessary, the court could then dismiss the case with prejudice. And if it showed otherwise, the court said that the plaintiffs would be "free to pursue the litigation without having to re-file the case." *Id.* In sum, the court found "that a stay prejudices neither [party] and benefits judicial economy." *Id.* Obviously, the court assumed that the plaintiffs may well have meritorious claims, and it gave no inkling that § 1927 sanctions might even be possible.

4. *September 4, 2013, to November 12, 2013*

During this interval, the case sat inactive while awaiting results from the mayoral election to shed light on any further need for plaintiffs to pursue their claims. I cannot see

8

how plaintiffs' attorneys did anything to multiply the proceedings in these two months. Instead, I see them waiting on standby in compliance with the district court's stay.

5. *November 13, 2013, to December 17, 2013*

On November 13, 2013, days after the mayoral election, the district court held a six-minute telephonic status conference with counsel for both parties. Addressing the district court's September stay, the plaintiffs' attorneys told the court that they had contemplated the stay would last through the following Tuesday's runoff election in District 7, which might render moot the with-or-without-prejudice issue. Significantly, plaintiffs' attorneys also offered to dismiss their federal claims (almost certainly with prejudice)[4] and instead proceed in state court with their state equal-protection claim. Neither the City nor the court accepted the offer. At the conclusion of the hearing, the district court continued the stay, informing counsel that it would set the case for another telephone conference in two to three weeks so that the parties could consult with their clients after evaluating the results from the District 7 election.

Here, it is important to remember that the district court's order dismissing with prejudice did not specifically address the viability of the state-law equal-protection claim. I am unsure whether the New Mexico Supreme Court would extend the state's equal-

---

[4] The majority expresses uncertainty whether the offer to dismiss was with prejudice. Maj. Op. at 16 n.7. Although the district court's language was not precise on this point, I believe it points toward the offer's having been to dismiss the federal claims with prejudice. The district court restated the plaintiffs' attorneys' argument as having "offered to dismiss the case without prejudice or dismiss the federal claims and allow the case to go back to state court . . . ." Appellant's App. vol. III at 410. The plaintiffs' attorneys characterize their offer as "to proceed on only their state claims in state court. . . ." Appellant's Br. at 28.

9

protection guarantee beyond what the Equal Protection Clause of the Fourteenth Amendment requires. Accordingly, I cannot see how the plaintiffs' attorneys multiplied the proceedings—let alone unreasonably and vexatiously—by insisting only on an option to pursue their state claims in state court. *See Arias v. Cameron*, 776 F.3d 1262, 1268 (11th Cir. 2015) (stating that district court should grant voluntary motion for dismissal without prejudice unless "the defendant will suffer clear legal prejudice other than the mere prospect of a second lawsuit"); *Davis v. USX Corp.*, 819 F.2d 1270, 1274 (4th Cir. 1987) ("It is well established that, for purposes of Rule 41(a)(2), prejudice to the defendant does not result from the prospect of a second lawsuit. . . . Indeed, in cases involving the scope of state law, courts should readily approve of dismissal when a plaintiff wishes to pursue a claim in state court." (citations omitted)).

On December 11, 2013, the district court ordered a status conference on December 17, 2013 at 11:00 a.m. But sometime before the hearing, the district court vacated it and never set another in its place.[5] Instead, on January 3, 2014, apparently out of the blue, the court issued an order dismissing the complaint with prejudice.[6] Without explaining its abrupt about-face in forgoing a status conference where plaintiffs would have reported the effect of the November elections, the court simply announced that, "[a]t this point, the Court does not see any benefit to further briefing or discussion." Appellant's App. vol. I

---

[5] In the order dismissing with prejudice, the district court said that it had vacated the December 17 hearing because the court's criminal proceedings that day went longer than expected. The court did not say why it never rescheduled another hearing to replace the one it vacated before dismissing the case with prejudice.

[6] The district court denied the city's earlier request to dismiss with prejudice as a sanction under Fed. R. Civ. P. 16(f) and Fed. R. Civ. P. 37(d).

at 196. In summary fashion, the court concluded that dismissal with prejudice was appropriate "because it is apparent that there is no longer a case to pursue." *Id.* at 195. Suddenly, and in contrast to its own stated view in September, the court declared that the plaintiffs' attorneys' expressed desire to evaluate the mayoral and District 7 election results before agreeing to dismissal with prejudice "would seem to be disingenuous" when "Plaintiffs still cannot make a decision about whether they have a meritorious lawsuit or not." *Id.* at 196. Although I do not understand why, the district court seemingly took offense that plaintiffs' attorneys had not somehow themselves scheduled a status conference to replace the one the court itself had earlier set and vacated without notice. Because of their failure to do so (if it can be called that), the court concluded that they "apparently do not want to admit that there is no merit to the underlying case, and yet do not wish to pursue litigation, even though the purpose of the stay was to give Plaintiffs the time to make that exact determination." *Id.* "For these reasons," the court dismissed the complaint with prejudice. *Id.* Ordinarily, this would end the case. But here it didn't.

6. *January 4, 2013, to August 29, 2014*

On January 17, 2014, relying in part on 28 U.S.C. § 1927, the City filed a motion seeking $106,003.51 in attorneys' and experts fees it incurred defending the suit from start to finish.[7] The City's motion reargued its earlier positions, including ones the district court had already passed on, such as discovery delays and abuse. Primarily, it relied on Sanderoff's report as proving that the plaintiffs' claims never had merit. From the

_____

[7] By the time of the May 2014 hearing on sanctions, the City claimed more than $134,000 in attorneys' fees. Most of these fees resulted from the City's motion to dismiss with prejudice and its motion for fees and sanctions.

11

attached hourly-fee charts, I see that the City sought reimbursement for all its fees expended from filing of the complaint in January 2013 through its dismissal in January 2014. Briefing by the parties followed.

On May 12, 2014, the district court held a hearing on the City's motion requesting fees and costs. The City called Sanderhoff as a witness, and the plaintiffs called one of its experts, George Korbel, and one of the named plaintiffs, Phillip Baca. On August 29, 2014, the district court entered its order granting in part and denying in part the City's motion for attorney fees, expert fees, and costs. After reciting the case's procedural history, the court again noted that "Plaintiffs had a good faith basis for filing a complaint; however, there came a point in the litigation when the case was no longer viable." Appellant's App. vol. III at 406–07. As what it styled its "magic date" marking lack-of-viability, the court chose June 25, 2013, the date the City provided plaintiffs with Sanderhoff's expert report.

Suddenly, in the district court's view, the Sanderoff report became a be-all, end-all curtain-closer against the plaintiffs' claims.[8] Nowhere did the district court mention or distinguish its earlier-stated views that the Sanderoff report had merely "poked holes" in the plaintiff's allegations by showing that Hispanics had fared well in earlier city elections. Appellant's App. vol. II at 201. Nowhere did the district court consider the City's failure ever to seek—let alone win—a dismissal under Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 56, even when armed with the supposedly unchallengeable Sanderoff

---

[8] *See Thornburg v. Gingles*, 478 U.S. 30 (1986); and *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga.), *aff'd*, 542 U.S. 947 (2004).

report. *Cf. In re Ruben*, 825 F.2d 977, 988 (6th Cir. 1987) (holding that "[t]he denial of the motions for summary judgment precludes a sanction on the ground that the claims against them were *legally* insufficient" and that "[a] sanction is generally improper where a successful motion could have avoided any additional legal expenses by defendants" (emphasis in original)).

I am wary of the district court's and majority's approach of resolving the sanctions motion as if it were a summary-judgment motion upon which the City must prevail. I agree with the plaintiffs' attorneys that had the City really brought a summary-judgment motion, the plaintiffs could have tested Sanderoff's conclusions under cross-examination and also marshaled their own experts and evidence to oppose the motion. *See, e.g.*, Fed. R. Civ. P. 26(e) (allowing experts to supplement their reports, requiring additions or changes to be disclosed by the time pretrial disclosures under Rule 26(a)(3) are due). Moreover, even if the City had prevailed on a dispositive motion, that hardly would automatically have qualified it for § 1927 sanctions. *See Bixler v. Foster*, 403 F. App'x 325, 328 (10th Cir. 2010) (unpublished) ("Losing is part of the lawyer's lot, and § 1927 isn't aimed at shifting fees from winners to lawyers who happen to represent the losing side.").

After reaching its result, the district court declared that it "would have been inclined to grant leniency towards Plaintiffs' counsel if they had simply acquiesced to Defendant's request to dismiss with prejudice." Appellant's App. vol. III at 407. Presumably, the district court's deadline for acquiescence would have come after the November 2013 elections since it had agreed that plaintiffs needed time to evaluate how

13

the charter amendment affected those claims. Although the district court acknowledged that the December 17, 2013 status conference "did not occur due to the Court's scheduling conflicts," it passed right by how its vacating that hearing kept the plaintiffs from reporting to the court whether the District 7 runoff-election results had ameliorated their concerns. *Id.* at 195**.** Rather than assume the plaintiffs' attorneys were awaiting the court to set another status conference before reporting their post-election position on their claims, the district court treated the plaintiffs' attorneys as having dawdled away a fair chance to update the court.

Eight months later, after extensive briefing and an evidentiary hearing, the district court imposed personal sanctions against plaintiffs' attorneys of $21,199.38 for the City's attorneys' fees imposed from June 25, 2013, through the dismissal on January 3, 2014, and another $27,018.57 for the City's attorney fees seeking sanctions after dismissal with prejudice on January 3, 2014, and through the May 2014 hearing.[9]

Again, I fail to see what the plaintiffs' attorneys did to multiply the proceedings from January 4, 2014, through June 24, 2014. First, no one alleges that the plaintiffs' attorneys delayed those proceedings. *Cf. Roth*, 388 F. App'x at 837 (disallowing post-judgment sanctions for opposing party's attorney's fees partly "because [the losing party] did not take any action to multiply the proceedings after the district court granted the motions to dismiss," resulting in our concluding that "the district court abused its

---

[9] The district court's order listed a correctly calculated $21,199.38 as the city's total attorneys' fees up to dismissal, but used the same figure for the city's total attorneys' fees seeking sanctions. Properly added, the total fees-seeking sanctions total $27,018.57. This brings the total of both sets of fees to $48,217.95, the amount the district court imposed.

14

discretion by including amounts incurred after that date in its award of fees and costs"); *Steinert*, 440 F.3d at 1224 (allowing fees incurred after judgment on a record showing "that the parties filed numerous and extensive briefs on the fee issue, and that [the sanctioned attorney] sought at least ten extensions of time to comply with the briefing deadlines").

Second, the plaintiffs' attorneys did not multiply the proceedings by refusing to pay the City's initial demand for $106,003.51 (all the attorney and expert fees it incurred from filing of plaintiffs' complaint). *Steinert* itself would deprive the district court of any authority to award § 1927 sanctions beginning from the initiation of the complaint. *See* 446 F.3d at 1224–25. It is hard to miss the irony here in the City's demand for sanctions for plaintiffs' supposedly meritless claims when its own claim for $106,003.51 ran afoul of *Steinert*, one of the highest-profile cases our court has on the § 1927 issue.

7. *Section 1927 with Voters-Rights Claims*

Although I recognize that § 1927 applies against all claims, I would more cautiously approach the awarding of sanctions in voters-rights claims. Stipulated facts supported the district court's conclusion that the plaintiffs had brought their complaint in good faith. Much had happened from years 2000 to 2010 with Albuquerque's population. It had grown by about 100,000 residents, and 75% of the growth was in the Hispanic population. Despite that, the new redistricting map kept Latino-majority districts flat at three of nine districts. Certainly, the Voting Rights Act affords citizens an opportunity to litigate to ensure they receive an "equality of opportunity." *See Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994).

15

I am far from convinced that any of the plaintiffs' claims for relief were meritless. And in particular, I question the district court's and majority's not separately analyzing the plaintiffs' state-law equal-protection claim. Everyone should agree that the New Mexico Supreme Court is fully empowered to interpret its state's equal-protection guarantee more broadly than the Supreme Court interprets the Fourteenth Amendment's guarantee.

I fear that the unintended but lasting result of this decision will be to frighten off potential voting-rights challengers and their attorneys lest they suffer considerable sanctions[10]—even when the redistricting governmental entity lacks sufficient confidence to file a Rule 12(b)(6) or Rule 56 motion.[11] "The purpose of [§ 1927 sanctions] is to deter dilatory litigation practices and punish aggressive tactics that far exceed zealous advocacy." *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006). Section 1927's purpose is not to deter plaintiffs from filing lawsuits. *See Blue v. U.S. Dep't of Army*, 914 F.2d 525, 534–35 (4th Cir. 1990) (noting that "[t]he sheer breadth and magnitude" of sanctions imposed in a Title VII case "gives us pause"

---

[10] From its resolution filed on February 14, 2014, I see that the newly constituted city council had the same concern. In that resolution, the city council stated its belief that "citizens who stand up to challenge the actions of their government in court, especially where such actions impact their rights to effective participation in their government, should not be threatened with possibility of crushing financial penalties[.]" Appellant's App. vol. II at 292.

[11] Here too, I see an irony that the City pursued the four Latino plaintiffs personally for sanctions in district court and on appeal, requiring extensive (and expensive) briefing in both courts, only to abandon that pursuit at oral argument in this court without notifying plaintiffs' counsel beforehand and after the plaintiffs' attorneys had expended scarce minutes of their oral argument time rebutting it.

16

because sanctions "may chill meritorious as well as meritless claims and dissuade deserving parties from ever bringing suit for fear of the concomitant burden of sanctions"). I am unpersuaded by the City's argument that the plaintiffs filed the complaint as a publicity stunt to rile local Hispanic voters. In my view, the Hispanic community would likely view the plaintiffs' voluntarily dismissing their own lawsuit much more favorably than it would the City's convincing the district court to dismiss it involuntarily over the plaintiffs' objection.

## 8. Conclusion

For these reasons, I conclude that the district court abused its discretion in imposing any sanctions against the plaintiffs' attorneys and would reverse the order granting sanctions and remand the case for the district court to vacate its order imposing sanctions. Accordingly, I respectfully dissent.